Jack GILES, Plaintiff,

v.

ST. PAUL FIRE & MARINE
INSURANCE COMPANY, a
corporation, Defendant.

Civ. A. No. 75 G 0603 NE.

United States District Court,
N. D. Alabama,
Northeastern Division.

Nov. 20, 1975.

Michael L. Edwards and Lee H. Zell, Berkowitz, Lefkovits & Patrick, Birmingham, Ala., for plaintiff.

Ralph H. Ford, J. R. Brooks, Jr., Ford, Caldwell, Ford & Payne, Huntsville, Ala., for defendant.

## MEMORANDUM OF OPINION

GUIN, District Judge.

This action for declaratory relief and damages was tried before the court on October 29 and 30, 1975. Plaintiff, an attorney licensed to practice law in the state of Alabama, seeks a determination of rights under a policy of professional liability insurance issued to his law firm, along with a corresponding order directing St. Paul Fire & Marine Insurance Company ("St. Paul") to underwrite the costs of defense in connection with two civil actions in which plaintiff Giles is a named defendant, to reimburse plaintiff for attorney's fees and expenses already incurred in the defense of those actions and to respond to any judgments which may be obtained against plaintiff to the extent of policy limits. The court having previously severed for further proceedings questions relating to the amount of reimbursement and to the ultimate obligation of coverage, the issue for decision here is whether St. Paul is contractually obligated to provide a defense for plaintiff in connection with the two lawsuits for which insurance coverage is sought. Having duly considered the testimonial and documentary evidence, which amply illustrates the novel factual setting from which this litigation arises, along with the ably presented arguments of counsel for both parties, the court, pursuant to Rule 52(a), Fed.R. Civ.P., hereby enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff is a resident citizen of Huntsville, Alabama, is over the age of twenty-one years, and is licensed to practice law in all the courts of the state of Alabama.

2. Defendant, a foreign corporation doing business in this state, is engaged in the business of writing professional liability insurance, and insured the plaintiff and his former law firm, Morring, Giles, Willisson, Higgs and Cartron (MGW), for the period January 1, 1974 to January 1, 1975, under Policy No. 501JD0413. This policy was in full force and effect at all times pertinent to the matters alleged in the complaint. Generally, the policy provided for payment by defendant on behalf of the plaintiff of damages arising out of the performance by the plaintiff of professional services as an attorney. The policy provided further that defendant would pay the costs and expenses of defending suits brought for damages arising out of plaintiff's performance of professional services as an attorney.

3. In late 1973 or early 1974, one of defendant's agents, James Thornton, delivered to plaintiff's law offices a professional liability insurance policy for the period January 1, 1974 to January 1, 1975. According to the testimony of Warren Nelson, the St. Paul official responsible for handling of lawyers' professional liability policies procured by insurance agencies in the Huntsville area, defendant considered the MGW policy issued for the calendar year 1974 to be a renewal of prior coverage. Although counsel for St. Paul have argued to the contrary, various items of correspondence addressed to MGW from the defendant and its agents, along with other documents prepared by the defendant and introduced as trial exhibits, repeatedly refer to and designate the policy in question as a renewal policy.

4. The evidence is undisputed that defendant incorporated certain changes in plaintiff's professional liability insurance policy for the calendar year 1974 which operated to reduce the coverage available for professional activities engaged in by plaintiff. Of particular significance are two policy provisions whose scope and impact are critical to the proper resolution of the present controversy. The first, which was captioned "Major Changes in St. Paul's Lawyers' Professional Liability Policy," provided in pertinent part for an exclusion from coverage for any insured's "knowing participation . . . in any activity rendered un-

lawful under Rule 10b–5 promulgated under Section 10(b) of the Securities Exchange Act of 1934 . . . ." The second, designated as a "Lawyers Securities Endorsement," stated that the policy did not provide coverage for any claims against or liability of any insured arising out of legal services rendered in connection with any offering, purchase, sale, exchange, or any other activity or transaction relating to securities covered or claimed to be covered by various state and federal securities statutes, including the Securities Act of 1933 and the Securities Exchange Act of 1934.

5. At the time of delivery of the 1974 policy, defendant's agent Thornton stated to plaintiff's law partner, Carl Morring, that he had been instructed to deliver the renewal policy personally because the policy contained "some exclusions". Accompanying the policy was a letter from Thornton to Robert Willisson, another of plaintiff's partners, which made reference to an exclusion from coverage ". . . in connection with the various Securities acts as indicted on the attached endorsement." However, Thornton did not at any time explain or elaborate upon any items of coverage which defendant sought to exclude from its professional liability insurance policy. Morring testified that he did not see or read Thornton's letter, and that Thornton merely directed his attention to the policy itself. Thornton's testimony in this regard was substantially in accord with Morring's, in that he recalled directing Morring's attention to the policy, and did not indicate that Morring actually read the letter in question.[1]

6. Upon reviewing defendant's renewal policy on behalf of plaintiff's law firm, Morring noted that the second page of the policy contained the designation, in bold-face type, of "Major Changes in St. Paul's Lawyers' Professional Liability Policy". Morring's attention was drawn to this section of the policy not only because of the bold-face type, but also because the statement was printed on pink paper, as opposed to the white paper which comprised the balance of the insurance documents.

7. Using the "Major Changes Statement" as a means of familiarizing himself with the scope of the policy's coverage, Morring noted that Item 4(a) of the Statement referred to an exclusion for "knowing participation . . . in any activity rendered unlawful under Rule 10b–5 promulgated under Section 10(b) of the Securities Exchange Act of 1934 . . . ." This particular exclusion already had been brought to the attention of Giles, Morring and Willisson, since the "Major Changes Statement" previously had been mailed to the firm's offices along with a renewal questionnaire from St. Paul.

8. Upon reviewing the "Major Changes Statement" which was attached to the questionnaire from St. Paul, Giles, Morring and Willisson had earlier concluded that, notwithstanding a reduction in policy coverage for the 1974 renewal period, Giles' professional activities nevertheless were insured provided that he committed no acts which he knew to be rendered unlawful under Rule 10b–5 promulgated under Section 10(b) of the Securities Exchange Act of 1934. Upon reviewing the prominently placed "Major Changes Statement" attached to the policy, Morring confirmed his and his partners' previous understanding as to the coverage for plaintiff Giles, and he ac-

---

1. Since there is no dispute that Thornton's letter was contained in the MGW insurance file, and since St. Paul contends that this letter should have focused the firm's attention on the "Lawyers Securities Endorsement", some further resolution of the testimony on this point is appropriate. It is apparent that the letter was not attached to the policy, but that both were contained in an envelope brought by Thornton to the MGW offices. Because there is uncontroverted testimony that no member of the firm saw or read the letter prior to the institution of the first civil action against plaintiff Giles, and because Thornton testified that he removed the *policy* from the envelope and placed it on Morring's desk, the available circumstantial evidence indicates that the letter remained in the envelope and was removed for filing by a secretary at some subsequent time. This analysis certainly is consistent with the evidence, and would explain why the firm's members were unfamiliar with the letter prior to the date of the first suit against Giles.

cepted the policy on behalf of the firm on the basis of this understanding.

9. At trial, St. Paul contended that Giles, Morring and Willisson were well aware of the company's intention to exclude from coverage in the 1974 policy virtually all securities-related professional activities, and, moreover, that MGW's belief that securities-related work performed by Giles was within policy coverage was based upon various misapprehensions of law for which the company could not be held responsible. In an attempt to support this position, St. Paul questioned Willisson and Morring at length concerning their reactions and responses to a renewal questionnaire received by MGW prior to the delivery of the 1974 policy, and relied upon a telephone conversation between Giles and O. L. Graham (defendant's Huntsville area claims manager), and upon an alleged telephone conversation between Morring or Willisson and Thornton.

The testimony upon which St. Paul relies simply does not support the contention that MGW, or any of its members, was aware of St. Paul's intention to withhold coverage for all securities-related professional services. First, even if the court were to draw from the testimony of Willisson and Morring those inferences most favorable to St. Paul, the evidence would at best support a finding that the substance and tenor of the renewal questionnaire led these partners merely *to expect that Morring's securities registration work* would not be covered by the terms of the 1974 policy. On the other hand, both Willisson and Morring had an affirmative expectation that, notwithstanding the possible exclusion of Morring's work, plaintiff Giles nevertheless would have the benefit of insurance coverage. Certainly there is no evidence in the record which would suggest that Morring or Willisson *knew or understood* that St. Paul intended a *total* exclusion for securities-related work.

Second, the fact that Giles, during the course of a telephone conversation with Graham, recited the titles of several securities acts which were included in the "Lawyers Securities Endorsement" does not lead inevitably to the conclusions that Giles was familiar with the scope and impact of this endorsement. Rather, the court credits Giles' testimony that he was not aware of the "Lawyers Securities Endorsement" prior to the filing of the first action in which he was a named defendant, especially in view of the fact that the statutes which Giles and Graham discussed were listed in the renewal questionnaire, which Giles in fact read.

█ Finally, the court has considered Thornton's testimony that he received a telephone call from Morring or Willisson requesting that the "Lawyers Securities Endorsement" be removed from the 1974 policy. Thornton was uncertain as to the date and time of this conversation, as well as to the identity of the person to whom he spoke, while both Morring and Willisson denied that the conversation ever occurred. With respect to the proper resolution of this critical issue, the court is mindful of several persuasive factors. For example, Willisson and Morring did testify that, prior to the delivery of the 1974 policy, MGW questioned Thornton as to whether Morring's registration work would be covered by the 1974 policy; however, such an inquiry concerning the scope of coverage can hardly be interpreted as a request to remove a particular endorsement *after* the policy was delivered. In addition, the court takes note that during the course of his testimony with respect to other issues, Morring had ample opportunity to relate facts which may have been untrue, but which would have served greatly to enhance plaintiff's factual contentions. In the court's view, the fact that Morring refrained from such conduct entitles his testimony, as compared with that of Thornton, to greater credit. As between the testimony of Willisson and Thornton, the court concludes that similar considerations entitle Willisson's recollection to greater credit. In reaching this judgment, it is not without significance that Thornton's testimony can be considered to be at odds with that portion of his previously filed affidavit which purports to relate the substance of all conversations with MGW

partners concerning the 1974 policy (and which contains no reference to a conversation concerning removal of the endorsement). More important, however, is Thornton's testimony that, upon receiving the alleged request from MGW for removal of the "Lawyers Securities Endorsement," he relayed that inquiry to a St. Paul official in Birmingham, who in turn informed him that the endorsement could not be removed from the MGW policy. The fact that St. Paul failed to call this Birmingham official, who was presumably within its control, who was unknown to plaintiff, and whose recollections clearly would have been material to a key issue in the case, raises a strong inference that the company would not have gained anything by virtue of his presence and testimony. In view of all of the factors expressed, the court is persuaded that Thornton's recollection of the disputed conversation was more than likely mistaken, and indeed that Thornton may well have confused the purported 1974 conversation with the 1973 conversation in which Willisson made certain inquiries respecting coverage in connection with Morring's securities registration work.

10. On October 7, 1974, Scott, Gorman, O'Donnell, Municipals, Inc., a corporation, filed suit against the plaintiff in the United States District Court for the Middle District of Alabama, in connection with services performed by plaintiff in his capacity as an attorney representing the Industrial Board of the Town of Mount Vernon, Alabama. On January 8, 1975, First Federal Savings & Loan Association of Utica, a corporation, filed a similar action against plaintiff in the United States District Court for the Middle District of Alabama. Both complaints charged plaintiff with negligent misrepresentation of facts, rather than with knowing participation in any violation of Rule 10b–5 or any other provision of the Securities Exchange Act of 1934. Plaintiff gave defendant due and timely written notice of the filing of these lawsuits and furnished defendant with a copy of each complaint. Both lawsuits are currently pending in the United States District Court for the Southern District of Alabama, to which Court the cases have been transferred.

11. Upon being notified of the pendency of the litigation described above, defendant refused to provide the costs of defense in connection with the proceedings therein and denied that any damages recovered in said actions would be payable by defendant under the terms of the policy of insurance that it issued. This refusal to defend and denial of coverage was predicated upon a "Lawyers Securities Endorsement", contained on page four of the policy, which purports to exclude coverage for virtually any professional activities or services performed in connection with the requirements of state or federal securities laws. In response to the denial of his claim, plaintiff independently sought and retained counsel to defend both federal civil actions.

## CONCLUSIONS OF LAW

1. Based upon the testimony and documentary evidence as indicated in Finding of Fact No. 3, *supra*, and in the absence of any evidence to the contrary, the court finds and concludes that plaintiff's professional liability insurance policy for the calendar year 1974 was a renewal policy. The mere fact of a change in policy limits or deductible amounts does not operate to transform the prior relationship between the parties into an original contractual undertaking without reference to the terms of prior policies. See *National Union Fire Ins. Co. v. Morgan*, 231 Ala. 640, 166 So. 24 (1936). See also *Couch on Insurance 2d* §§ 68:60–68:61 (1968).

2. Because the policy here at issue constituted a renewal of prior coverage, defendant was obligated to call its insured's attention to any reductions in the scope of policy coverage; failing this, the defendant would be bound by the greater coverage set forth in an earlier policy. See, e. g., *Government Employees Ins. Co. v. United States*, 400 F.2d 172 (CA 10, 1968); *Southern Farm Bureau Casualty Ins. Co. v. United States*, 395 F.2d 176 (CA 8, 1968). Cf.

*Couch on Insurance 2d* §§ 68:60–68:61 (1968). Similarly, in a situation where the insured's attention is drawn to one reduction in coverage, and the insurer subsequently relies on a broader reduction as to which the insured is not adequately informed, the same result should obtain and the insured should have the benefit of the greater coverage. Stated otherwise, the court is of the opinion that providing an insured with incomplete or misleading information with respect to changes or modifications in a renewal policy has the same effect as a failure to inform the insured of any changes at all; consequently, in such a situation, the insurer should be able to enforce only those changes in coverage as to which the insured has been reasonably informed.

■ In apparent recognition of this obligation, St. Paul independently forwarded a copy of the "Major Changes Statement" to plaintiff's offices prior to delivery of the actual policy. In addition, this "Major Changes Statement", conspicuously colored and printed in bold-face type, appeared as page two of the policy,[2] preceding every other provision of the insurance contract, with the exception of the basic declarations.

■ Although it appears that defendant's agent Thornton made some attempt to reveal the existence of the "Lawyers Securities Endorsement", the court is of the opinion that the circumstances surrounding the preparation and delivery of the disputed policy[3] (and in particular, the prominent placement in the policy of the "Major Changes Statement") justified MGW's conclusion that the changes in coverage embodied in this statement were the only changes sought to be incorporated by St. Paul in the 1974 renewal contract.[4]

■ Attempted incorporation of the "Lawyers Securities Endorsement" certainly constituted a "major change" in MGW's 1974 policy; one of St. Paul's own witnesses readily conceded this point. However, in view of defendant's failure to refer to the endorsement in the text of the "Major Changes Statement", or to point out the endorsement's presence in an otherwise satisfactory

---

2. Despite the placement of the "Major Changes Statement", defendant contends that this document does not constitute a part of the 1974 MGW policy. The short answer to this contention is that the entire policy, including the "Major Changes Statement", was attached as Exhibit "A" to plaintiff's complaint, and that defendant, in paragraph 3 of its answer to the complaint, admitted ". . . that a true and correct copy [of the 1974 MGW policy] is attached to plaintiff's complaint as exhibit 'a' . . . ." Defendant at no time sought to amend its answer, and the court considers the company to be bound by its admission therein. In any event, even assuming for the purposes of argument that the "Major Changes Statement" had not been admitted to be an operative provision of the policy, its presence as an index or summary of policy provisions nevertheless would render it part of the insurance contract as a matter of law. See *Inter-Ocean Casualty Co. v. Scruggs,* 24 Ala.App. 130, 131 So. 549 (1930).

3. As indicated in Finding of Fact No. 5 and the text of its accompanying note 1, *supra,* St. Paul's sole attempt to notify MGW of the existence of the "Lawyers Securities Endorsement" consisted of a reference to the endorsement in Thornton's letter to Willisson. Crediting Morring, who testified that he saw neither the letter nor its attachment (the "Lawyers Securities Endorsement"), Thornton *must* have seen that Morring did not read this document. Despite this fact, Thornton did not call Morring's attention to anything but the policy itself.

4. Indeed, the court concludes that Morring's failure to review the provisions of the policy beyond the "Major Changes Statement" was in large measure a direct result of his conversation with Thornton. Thornton handed only the policy to Morring, advising him to look for a securities exclusion. Morring followed these instructions, found a securities exclusion in the "Major Changes Statement" and there his inquiry ended. Defendant makes much of the fact that Morring did not read the entire policy and that, had he done so, the firm would have been informed of all changes that St. Paul sought to incorporate in the 1974 policy. Assuming that such a reading would have informed Morring of a total securities exclusion (it might as easily have confused him as to the scope of policy coverage), the fact remains that Morring was not legally obligated to perform that task. MGW's insurance was *renewal* policy; rather than being obligated to review the policy in detail, or to look for a letter from defendant's agent, Morring, on behalf of the firm, was fully entitled to rely on a policy provision which purported to reflect every major change incorporated in the 1974 policy.

manner, the court considers that defendant's obligation to provide a defense in the litigation against plaintiff Giles is conditioned upon the applicability of the "knowing participation" exclusion in the "Major Changes Statement," rather than upon the broader exclusion contained in the "Lawyers Securities Endorsement."

3. In addition, the court concludes that, notwithstanding the lack of adequate notification of the presence of the "Lawyers Securities Endorsement," St. Paul has failed to explain how this endorsement and the "knowing participation" exclusion in the "Major Changes Statement" properly could find their way into the same insurance policy. The court understands the argument made in answer by St. Paul: that there is no ambiguity between the "Major Changes Statement" and the "Lawyers Securities Endorsement," because [1] paragraph 4(a) of the "Major Changes Statement" is the same as exclusion 4 of the policy, and [2] it is not uncommon for a broad exclusion to be added by endorsement with the intent that it conflict with other policy provisions. The court understands this principle, but having found that the "Major Changes Statement" is a part of the policy, holds that its wording—to the effect that "These are all the major changes"—created an ambiguity between it and the "Lawyers Securities Endorsement." Perhaps St. Paul, in preparing the policy documents, simply included two conflicting statements of securities-related coverage. Placing both provisions in the policy could have created such confusion as to the scope of coverage that the plaintiff and his partners easily might have been misled and caused to rely upon the "Major Changes Statement" as a correct statement of the securities law risks for which St. Paul would or would not provide coverage. At a minimum, the presence of both exclusions created a very real ambiguity, in that one purported to reflect all major changes in the 1974 policy, while the other contained a major change to which

the first made absolutely no reference. The applicable rule of construction in the face of conflicting or ambiguous policy provisions is clear: the court must adopt the construction most favorable to the insured, which in this case means that the provisions of the "Major Changes Statement" are controlling.

4. St. Paul seeks to counter the conclusions that MGW was misled by the "Major Changes Statement," or that the 1974 policy contained a significant ambiguity, with the argument that such conclusions disregard the manifest intention of the parties. In short, defendant contends that MGW could not actually have been misled by the "Major Changes Statement," since the firm was fully aware of the company's intention to provide a total exclusion for securities related work, and that construction of an ambiguous insurance policy must in the final analysis conform to the intention of the parties. See *American Liberty Ins. Co. of Birmingham v. Leonard,* 270 Ala. 17, 115 So.2d 470 (1959); *Louis Pizitz Drygoods Co. v. Fidelity and Deposit Co.,* 223 Ala. 385, 136 So. 800 (1931). In view of Finding of Fact No. 9, *supra,* this argument must be rejected. The major fallacy in defendant's position is that there was no meeting of the minds between St. Paul and MGW with respect to securities related coverage in the 1974 policy. While St. Paul presumably intended wholly to exclude securities related work from the range of risks which it was willing to underwrite, MGW entertained an expectation or "best guess" that the policy would contain a *limited* securities exclusion which would be applicable to Morring's registration work, but under which Giles' professional activities would be insured (absent his "knowing participation" in any conduct rendered unlawful under Rule 10b–5). Thus, in point of fact, the intent of the parties to the 1974 policy was hardly identical, and indeed reflects so little common ground that the court could not properly construe the policy on the basis of so limited an area of mutual intent.[5]

5. In this connection, defendant urges that its contention as to the mutual intent of the parties is bolstered by the fact that the partners

of MGW are experienced attorneys who are familiar with the terms and tenor of insurance policies. Such an argument ignores the fact

In view of these findings, the court remains persuaded that St. Paul's obligation of defense rests upon the applicability of the "knowing participation" exclusion in the "Major Changes Statement."

 5. Turning to the task of properly construing the "knowing participation" defense, the court must reject as too narrow the interpretation that "knowing participation . . . in any activity rendered unlawful under Rule 10b–5" creates an exclusion from coverage for all acts in which an insured knowingly engages or participates. Rather, in light of the applicable rules of insurance policy construction, the court is persuaded that, in order for the "knowing participation" exclusion to be applicable, the insured must participate in or commit acts which he knows to be in violation of Rule 10b–5.

6. Having raised the "knowing participation" exclusion as the basis for denial of any obligation of defense, St. Paul must carry the burden of proof with respect to the applicability of this exclusion. See, e. g., *Bankers Fire & Marine Ins. Co. v. Contractors Equipment Rental Co.,* 276 Ala. 80, 159 So.2d 198, 200–201 (1963); *Bankers Fire & Marine Ins. Co. v. Bukacek,* 271 Ala. 182, 123 So.2d 157 (1960). From the evidence presented, the court cannot find that plaintiff Giles committed or participated in any acts in connection with professional services rendered to the Industrial Board of the Town of Mount Vernon which he knew to be unlawful under Rule 10b–5 promulgated under Section 1θ(b) of the Securities Exchange Act of 1934.

For the reasons stated herein, the court concludes that St. Paul is contractually obligated to provide the costs of defense in connection with litigation emanating from the Mount Vernon bond issue in which plaintiff Giles is a named defendant, and consequently is obligated to reimburse plaintiff Giles and his partners the amount of fees and expenses already paid by them for the defense of such litigation, provided such fees and expenses are reasonable. The court reserves jurisdiction to enter a judgment for the reasonable amount of such fees and expenses and to determine the ultimate liability of St. Paul to pay any judgment which may be rendered against plaintiff Giles in the litigation pending against him. Judgment is entered by separate order.

---

that plaintiff and his partners are *not* experienced attorneys with respect to insurance or securities law. Since the members of MGW cannot be credited with any particular expertise in these areas of law, a mere allusion to their status as attorneys hardly serves to clarify their intentions with respect to the firm's professional liability insurance policy. Moreover, the fact that plaintiff and his partners are attorneys cannot affect the court's construction of ambiguous policy provisions, since the language of the policy is to be attributed its normal and customary meaning as understood by laymen. See, e. g., *Universal Underwriters Ins. Co. v. Marriott Homes, Inc.,* 286 Ala. 231, 238 So.2d 730 (1970).