474 A.2d 1346

**Richard E. KRAMER, et al.**

v.

**James H. McCORMICK.**

**No. 1263, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

May 14, 1984.

**194**

Jeffrey N. Pritzker, Baltimore, with whom were Margolis, Pritzker & Epstein, P.A., Baltimore, on brief, for appellants.

Peter B. Turney, Baltimore, for appellee.

Argued before MOYLAN, LOWE and BELL, JJ.

LOWE, Judge.

—prologue—

Literally, if not historically, money lending has not been an industry held in the highest esteem. Historians have demeaned such lenders,[1] playwrights have derided them.[2] It is at best a chancy business; at worst it can be dangerous. Public concern is reflected by its unique posture as

---

1. Exodus 22:24.

2. W. Shakespeare, *The Merchant of Venice; The Tragedy of Hamlet, Prince of Denmark,* Act I, Scene III, 1. 75–77.

the only industry constitutionally controlled absent legislative limitations. The Md. Const. Art. III, § 57 states that

"[t]he Legal Rate of Interest shall be *Six per cent. per annum;* unless otherwise provided by the General Assembly."

The General Assembly has tried to keep up with the ingenuity of the industry's exacting of profits from lending by means other than interest—such as points, forfeitures, prepaid interest, prepayment penalties and the like—but fully understood that contemporary society was more and more dependent upon credit. Rather than driving the industry to obscure its profits or dry up lending altogether, it began to relax its limits on interest. It varied the rates according to the degree of risk involved.

Procedurally the Legislature generally decided that the legal rate of interest should remain at 6 per cent. per annum. Comm.Law, § 12–102. It then permitted proportionately increased rates of interest for 1) loans under written agreements, 2) loans secured by residential real estate, 3) unsecured installment loans, 4) secondary mortgage loans, 5) retail installment sales, 6) small loans, etc. Significantly, it appears that the Legislature felt that commercial and corporate borrowers did not need any of the limitation protections which it had graduated for the rest of us; it declared that loans to corporations or those borrowing' over $5,000 for commercial purposes could be charged interest without limit. Comm.Law, § 12–103.

As the interest rates were relaxed the penalties for usury were increased. In addition to criminal penalties imposed for violating the loan laws, Com.Law, § 12–414, the Legislature imposed substantial civil penalties:

"Except for a bona fide error of computation, if a lender violates any provision of this subtitle he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan. In addition, a lender who knowingly violates any provision of this subtitle also shall forfeit to the

borrower three times the amount of interest and charges collected in excess of that authorized by law." Com.Law, § 12–413.

Obviously, this treble excess interest penalty was intended to deter the temptation to exceed the liberalized rates; however, there were lenders still not satisfied by the liberalized interest nor deterred by the treble damages. Users could avoid interest limitations simply by having a distraught borrower sign an affidavit that his loan was a commercial one; that is, solely to acquire or carry on a business or commercial enterprise. Com.Law, § 12–101(c)(1).

Effective July 1, 1980, the Legislature devised a deterrent to that practice as well. It exposed those lenders who knowingly tried to circumvent the legal limits imposed by the Legislature through such a subterfuge to another penalty of treble interest and charges contracted for beyond legal limits.

"(a) *Prohibited.*—A person may not require a borrower, as a condition to receiving a loan to make any false or misleading statement or characterization that a loan is a commercial loan under §§ 12–101(c), 12–103(e), or 12–105 of this subtitle if the loan is not a commercial loan.

(b) *Penalty.*—Any person who willfully requires a borrower to make a false or misleading statement in violation of subsection (a), or who willfully procures such statement, knowing that it is false or misleading, shall forfeit to the borrower three times the amount of interest and charges contracted for or collected in excess of that permitted by law, in addition to any other penalty otherwise provided in this title." Com.Law, § 12–106.1.

—facts—

Because the loan at issue in this case was made on July 31, 1980, perhaps appellant lenders were not aware of their exposure when they required an affidavit from appellee that their loan of $15,000 to him for the purpose of paying off a foreclosed second mortgage, defaults in a first mort-

gage and a fuel bill reduced to judgment, was solely to carry on a commercial enterprise.

Appellee, James H. McCormick's problems had begun before he ever met any of the appellants. Although he owned a home worth $72,000, it was encumbered by a first mortgage (Leeds Federal Savings and Loan) of approximately $40,000 and a second mortgage of nearly $10,000 (North American Credit Corporation). In 1978, appellee's small medical-supply business failed and it took nearly a year for him to find a job. That employment lasted another year and by 1980, appellee was again unemployed. His debts mounted; he was in default on both mortgages; North American foreclosed; the sale was scheduled for July 31, 1980.

Appellee contacted North American about three days before the sale to ascertain how he might avert that catastrophe and was referred to North American's lawyer, Jay Fred Cohen. Despite Mr. Cohen's seeming acquiescence to the request to "postpone" the foreclosure for the $1300 that appellee had raised, Cohen proposed a different solution to Mr. McCormick.

"He indicated to me that the $1,300, he could accept it, but I would be back, by not working I'd be back in the same position, you know, that I was in if he accepted the money. He says, he became my advisor, and he says, 'Maybe what you should do is get it refinanced, and that will give you time to get some additional monies,' which sounded okay because I was sort of pressed for money at the time. So he indicated to me that he knew someone that was in the money loaning business, that was up the street from him, two or three doors up the street.

Q   Did he name him?

A   Yeah, he called his name then, but it wouldn't ring a bell to me. I don't know if he did call his name, because he says, 'I have a friend,' or, 'Someone comes in here all the time that loans money.' So he says, 'Maybe he can

help you,' like that. So I says, 'Well, let me talk to him.' He says, 'He was just in here a couple of minutes ago.' I think he had his secretary look around. 'I think he should have been upstairs,' or something. But he wasn't upstairs. So he says, 'He's in and out of here every ten or fifteen minutes, so he'll probably be back.' So we started talking a little bit more. And then Mr. Mirsky came in, and he introduced me to him.

Q   You are referring to the same Mr. Howard Mirsky—

A   Right, uh-huh. And he told him, Fred Jay Cohen said to Mirsky, 'Mr. McCormick needs some money. Do you think you can help him?' And Mirsky says, 'Maybe so, I don't know.' He says, "Why don't you come up to my office and we'll sit down and talk about it,' which I did."

Mr. Mirsky perceived the essence of appellee's pecuniary concerns, had him pay off an overdue real estate tax and agreed to refinance the second mortgage loan. Appellee was told to be at Mr. Mirsky's office on the morning of July 31, 1980—the same day the foreclosure was scheduled for the afternoon. Apparently among the many papers placed before Mr. McCormick for his signature was an affidavit indicating that the money borrowed was for the purpose of entering the insurance business, although appellee did not specifically recall it. In fact, he testified that he clearly told the mortgage broker, Mr. Mirsky, the broker's lawyer, Mr. Kramer, and even Jay Fred Cohen, that he had no business and was not anticipating starting another one. He hoped to work as an insurance salesman, but as an employee of another, not in a business of his own.

"Mr. Mirsky and Mr. Kramer, I told both of them, I even mentioned it to Fred Jay Cohen that I didn't have a job. He indicated to me that, 'Well, I'm not supposed to make a loan of this size, I'm not licensed,' or, 'I'm not for something of this size unless you have a business.' I

said, 'Well, I don't have a business.' He said, 'Well, we can work out something.' He said, 'Who do you think you will be going to work for?' I says, 'Hopefully I'm supposed to go to work for Paul Revere tomorrow or the next day, or something like that.' He said, 'Well, okay, then we'll work out something,' like that. So I left it at that."

To avert the foreclosure by a noon deadline, appellee "signed the papers" that were ready for him when he entered the office. These included a second trust on McCormick's home with Mirsky and Kramer as trustees for Associated Mortgage Group and/or Howard W. Mirsky. In addition to Mirsky, the Associated Mortgage Group consisted of Ellis Shapiro and Dennis Weiner. The terms of the second trust loan were not overly complicated. The loan was for $15,000, from which the foreclosed second mortgage was paid off in the amount of $9,259; the first mortgage back payments were paid up in the amount of $1,355; a fuel oil bill reduced to judgment was paid in the amount of $270; and a mortgage broker fee was paid to Mirsky in the sum of $4,000 (from which he paid $82.50 recording costs). Twenty-seven percent interest was payable monthly for the eighteen month term of the loan at the end of which (February 1, 1982) the entire principal was due and payable.

By March 27, 1981 the loan was in default. Suit was docketed foreclosing the deed of trust. On July 7, 1981, appellee's 70 to 75 thousand dollar home was sold to Dennis H. Weiner on behalf of General Realty Co. for $1,000, subject to a mortgage of $35,420.16. General Realty Co., coincidentally, was a partnership consisting of Dennis Weiner, Ellis Shapiro and Howard E. Mirsky. In January of 1983, the sale was set aside for failure to comply with the registered mail notice requirement of Md. Rule W74 a. 2. (c), exceptions sustained and a resale of the property was ordered.

In the meantime appellee's attorney struck his appearance but like Antonio, McCormick found his Balthasar and new counsel entered the case. He filed a petition on behalf of appellee to enjoin the foreclosure and for a money decree, claiming among other things that appellants' loan had violated the lending laws subjecting them to civil penalties. These penalties, he pointed out, created a debt from appellants to appellee which "greatly exceed" the deed of trust debt from appellee to appellants:

"Accordingly, McCormick is not indebted to the Lenders, nor for that reason, is there any default in the Deed of Trust or the debt it secures. On balance, it is the Lenders who are indebted to McCormick."

No injunction issued and no hearing was granted appellee. The sale went forward and on April 12, 1983, the Associated Mortgage Group purchased the property for $10,000, subject to a prior first mortgage now amounting to $40,341.73. Appellee excepted to the ratification of the foreclosure sale for numerous reasons, including the fact that the pending injunction petition stultified prospective buyers. Again he reiterated that:

"He is not indebted on said Deed of Trust. The loan was tainted with usury, for which the statutory penalties exceed the amount he would otherwise owe."

This was the primary argument at the hearing on exceptions.

After hearing witnesses and argument, the court held that the presumption created by the affidavit of commercial purposes had been rebutted. *Duckworth v. Bernstein*, 55 Md.App. 710, 712–13 n. 2, 466 A.2d 517 (1983). By its decision held *sub curia* until July 20, 1983, it issued an order finding that the loan was not commercial, that the appellants knowingly violated § 12–106.1 by willfully having procured a false and misleading statement that the loan was commercial and that the penalties therefore exceed by

$18,693.70 the amount the lenders were entitled to receive from the borrower. He then sustained the exceptions to the sale and entered a money decree in favor of appellee for $18,693.70.[3]

Although the decree was filed and docketed on July 21, 1983, it was not mailed to counsel as had been the custom of the judge. On or about September 7, 1983 appellee's attorney discovered the decree and courteously passed it along to appellants' counsel. Appellants promptly filed a motion on September 19, 1983 to set aside or "Reissue" its decree.

The judge wrote to counsel saying that since it had been his custom promptly to mail his opinions to counsel he felt "constrained to file an Amended Order so that an appeal can be taken if the parties decide to do so." On September 23, 1983 he filed an "Amended Order and Decree" which but for the word "Amended" in its title repeated the July 21st decree in totidem verbis.

On October 5, 1983 appellants noted an appeal raising six issues, one of which they subsequently conceded.[4] The essence of the appeal is the contention that usury, which was the basis of appellee's contention, is not cognizable upon exceptions to ratification because it "affects only the distribution of the proceeds not the sale itself." *Warfield v. Ross*, 38 Md. 85 (1873). They contend that usury is reserved for exceptions to the audit because it does not affect the trustee's power to sell, citing *Powell v. Hopkins*, 38 Md. 1 (1873), which they point out goes on to add as additional reasoning that the mortgagor is required to

---

**3.** Appellants complain that they "have been left to decipher by themselves how the judgment of $18,693.70 against them was determined." Motion for a statement of grounds for that decision under Rule 18 should have been made for a later complaint on appeal to be accepted. *Gerard C. Wallace Co. v. Simpson*, 267 Md. 702, 298 A.2d 881 (1973).

**4.** "The claim of usury was barred by the Statute of Limitations pursuant to 5–107, Courts and Judicial Proceedings Annotated Code of Maryland."

"pay, or bring into Court to be paid, the principal and legal interest, before he can claim the intervention of a Court of Equity, by injunction." *Id.* at 13.

See also Md. Rule W76 b 2(1).

Significantly, those cases and all of the cases appellants cite for the principle that usury is "not a ground for setting aside or for enjoining a mortgage foreclosure sale" were written before the civil penalties for usury and other lending law violations could exceed the amount of the loan. Prior to the late 1960's, usury carried a relatively insignificant civil penalty. Here the penalty for the usurious amount was based upon the difference between the 16% then allowed for second mortgage loans and the 27% exacted. Section 12–413 provides that three times the excess interest collected and the excess costs charged (nearly $4,000) is the penalty due from appellants to appellee for the usury violation. In addition, for the willful procurement of the false affidavit the forfeiture is three times the excessive interest and charges contracted for or collected. Com.Law, § 12–106.1(b). All of these are easily ascertained from the record and support the judge's conclusion that the total exceeded the debt by more than double.

It is apparent that equity will permit a foreclosure sale to be set aside or enjoined when there is no debt due under the mortgage or the deed of trust. In the past setoffs have been cognizable in the audit exceptions only when they were less than the mortgage debt. See, *e.g.*, *Ehrhart v. Bldg. & Loan Assn.*, 157 Md. 40, 145 A. 202 (1929); *Spencer v. Almoney*, 56 Md. 551 (1881). But when offsetting penalties due the debtor from the creditor for that very loan exceed the debt itself, it would be absurd as well as inequitable to permit a homeowner to lose his home for a debt that was not due.

■ Ratification would seem to be the logical time and method because since there will be no proceeds to distribute the court is not passing upon distribution but rather is deciding objections to the validity of the mortgage. Com-

pare *Kirsner v. Mortgage Co.*, 154 Md. 682, 688, 141 A. 398 (1928); see also E. Miller, *Equity Procedure* § 468. If there is no debt, due this would certainly be a reason why the sale should not be ratified. Indeed, if such objections to the right to sell are not allowed before sale or upon ratification, they are foreclosed thereafter and that is hardly in conformity with the conscience of an equity court.

The issues of clean hands, agency, and counsel's (their own) conflict of interest are matters either not raised below or subsumed within the judge's implicit rulings which we found to have been supported by sufficient evidence. Such evidence was also sufficient to assure that the trial court was not "arbitrary and capricious" in its findings of fact; more pointedly, neither was it clearly in error. Md. Rule 1086. For all practical purposes then, our opinion could end here; however, appellee renewed in his brief a motion to dismiss prefatorily denied without prejudice. We must therefore address that issue to determine whether we had jurisdiction to address the merits.

As noted above the original Order and Decree dated July 20, 1983 was entered upon the docket on July 21, 1983. Md. Rule 1012 a provides that:

> "Whenever an appeal to this Court is permitted by law, the order for appeal shall be filed within thirty days from the date of the judgment appealed from except as provided in sections c. and d. of this Rule."

Sections c and d dealing with Orphans' Court and Criminal Appeals have no applicability here, consequently in order for appellants to appeal timely their order should have been filed within 30 days from the date of the judgment appealed from or prior to August 20, 1983.

Appellants did not file an appeal within the prescribed period. Rather, on September 19, 1983, nearly 60 days later, they filed a "Motion To Set Aside, And/Or Set Aside and Reissue Order and Decree" citing in their Memorandum of Points and Authorities Md. Rule "25". Since there is no Md. Rule 25 we assume they referred to Md. Rule 625 a:

"For a period of thirty days after the entry of a judgment, or thereafter pursuant to motion filed within such period, the court shall have revisory power and control over such judgment. After the expiration of such period the court shall have revisory power and control over such judgment, only in case of fraud, mistake or irregularity."

█ Even so assuming, that rule is not apposite because under it the court had no revisory power or control over the judgment beyond the 30 day period prior to enrollment. Furthermore there was no allegation of fraud and as Chief Judge Gilbert pointed out in *Maryland Metals, Inc. v. Harbaugh,* 33 Md.App. 570, 576, 365 A.2d 600 (1976), the failure of counsel to keep apprised of the docket is not a mistake or irregularity contemplated by the rule sufficient to extend the court's revisory power:

"Lest there be any misconception that an attorney's ignorance of docket entries is not a 'mistake or irregularity' in the Md. Rule 625 a sense, the Court of Appeals, in a host of cases, has laid that idea to rest. *Cohen v. Investors Funding Corp.,* 267 Md. 537, 541, 298 A.2d 154, 156 (1973); *Ventresca v. Weaver Bros.,* 266 Md. 398, 407, 292 A.2d 656, 661 (1972); *Maggin v. Stevens,* 266 Md. 14, 18, 291 A.2d 440, 442 (1972); *Penn Central v. Buffalo Spring,* 260 Md. 576, 582, 273 A.2d 97, 100 (1971); *Mutual Benefit Society v. Haywood,* 257 Md. 538, 541, 263 A.2d 868, 870 (1970); *Grantham v. Prince George's Co.,* 251 Md. 28, 36, 246 A.2d 548, 552 (1968); *Tasea Investment Corp. v. Dale,* 222 Md. 474, 479, 160 A.2d 920, 923 (1960); *Pumphrey v. Grapes,* [215 Md. 573, 138 A.2d 916 (1958)], *supra;* and *Baltimore Luggage v. Ligon,* [208 Md. 406, 118 A.2d 665 (1955)], supra." *Id.* at 576, 365 A.2d 600.

As a consequence the beneficent effort of the trial judge to overcome his oversight in failing to mail counsel copies of his decrees when filed so as to permit appellants a right of review would seem to have been to no avail. See *Sapero & Sapero v. Bel Air Plumb.,* 41 Md.App. 251, 396 A.2d 317

(1979). It is counsel's duty to follow the dockets, and absent a local or general rule entitling counsel to rely upon another court official, he cannot rely upon his unawareness of an entry of judgment. It is not alleged or shown that there is any such rule applicable here. But see Md. Rule 1219 a. Both *Pumphrey* and *Harbaugh* (and a plethora of other cases) make it clear that a "customary practice" may not be relied upon to alleviate a lawyer's docket review responsibility.

*Harbaugh* is indistinguishable from the facts in this case. In *Harbaugh* the judge struck his order and handed down "the same order" for the purpose of permitting an appeal, reciting (because of) "an office error, a copy of the decision was not mailed as is customarily done in the County". *Id.* [33 Md.App.] at 573, 365 A.2d 600. In the case before us the judge's digression from custom was confessed in a letter to counsel and rather than striking and handing down the same order, the judge here republished the same order but captioned it "Amended". Even if the order had been actually changed or amended, the judge had no authority to do so beyond the 30 day period. But there is another twist to this procedural issue.

Following our decision in *Harbaugh,* the Legislature enacted Cts. & Jud.Proc.Art. § 6–408 which was identical to Md. Rule 625 a, but added to the fraud, mistake or irregularity grounds permitting the court revisory power beyond the 30 day period, the failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule:

"For a period of 30 days after the entry of a judgment, or thereafter pursuant to motion filed within that period, the court has revisory power and control over the judgment. After the expiration of that period the court has revisory power and control over the judgment only in case of fraud, mistake, irregularity, *or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule.*" (Emphasis added).

Md. Rule 1219 a directs *the clerk* to serve court orders propitiously upon parties or their attorneys.

"Upon entry on the docket, the clerk shall send all parties entitled to service under Rule 306 (Service of Pleadings and Other Papers) a copy of any order or ruling of the court not made in the course of a hearing or trial unless the record discloses that such service has already been made. This Rule does not apply to show cause orders and orders nisi."

■ Although the judge breached only a personal policy or custom which is not comprehended by Cts. & Jud.Proc. Art., § 6–408, the duty failed by the clerk is mandated by the rule and is thus comprehended by the statute. Judge Buchanan had continuing revisory power over his order which the clerk had failed to serve.

We will, therefore, deny the motion to dismiss and affirm the judgment for the reasons first noted.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.