536 A.2d 1214

GOVERNMENT EMPLOYEES INSURANCE COMPANY

v.

Frances ROPKA, Personal Representative of the Estate of Michael Chilcoat et al.

No. 496, Sept. Term, 1987.

Court of Special Appeals of Maryland.

Feb. 11, 1988.

Certiorari Denied May 31, 1988.

250

Daniel W. Whitney (David M. Buffington and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellant.

John R. Penhallegon (Smith, Somerville & Case, on the brief for appellee, Consolidated Rail Corp.), Baltimore, Richard H. Offutt, Jr. (Hoffman & Comfort, on the brief for appellee, Frances Ropka), Westminster, for appellees.

Argued before WEANT, ALPERT and ROBERT M. BELL, JJ.

ALPERT, Judge.

## FACTS

On October 15, 1982, Michael Chilcoat and his wife and two daughters were killed in a tragic automobile accident. Michael Chilcoat was driving the automobile that was involved in an accident with a truck operated by Consolidated Rail Corporation (hereinafter "Conrail").

The personal representatives of the four decedents filed a wrongful death action against Conrail and the Pennsylvania Department of Transportation. Those defendants filed a third-party claim against the estate of Michael Chilcoat, seeking contribution and/or indemnification because he was the driver of the other vehicle. Frances Ropka, the personal representative of Michael Chilcoat's estate, demanded that Government Employees Insurance Co. (Michael Chilcoat's insurer, hereinafter referred to as "GEICO") defend against the third-party claim. GEICO refused to defend the third-party action, arguing that a "household exclusion" in the policy protected it from liability. The exclusion provided:

*Bodily injury* to an *insured* or any family member of an *insured* residing in the *insured's* household is not covered.

(Emphasis in the policy).

GEICO filed a declaratory judgment action in the Circuit Court for Carroll County. GEICO sought a declaration that the household exclusion was valid, and that GEICO was not required to defend any claims against, nor pay any judgments rendered against, Michael Chilcoat's estate.

After the declaratory judgment action was filed, but before a hearing was held on the merits, the Court of Appeals of Maryland decided *Jennings v. Government Employees Insurance Co.*, 302 Md. 352, 488 A.2d 166 (1985). *Jennings* held that a household exclusion in an automobile liability insurance policy was inconsistent with public policy and thus was invalid.

A trial on the declaratory judgment action instituted by GEICO was held on December 5, 1985, the Honorable Donald J. Gilmore presiding. In an order dated June 26, 1986, Judge Gilmore held that the household exclusion, pursuant to *Jennings*, "was void from the beginning," and that GEICO was required to defend Frances Ropka and pay any judgment arising out of the third-party case. The 30–day period for appeal expired without appeal by GEICO. Then on October 2, 1986, counsel for GEICO filed a Motion to Revise Enrolled Judgment. The attorneys for GEICO filed affidavits with the court stating that they had not received a copy of Judge Gilmore's order of June 26, 1986. They asked for a reissuance of the order, to give them time for an appeal.

A hearing on the Motion to Revise Enrolled Judgment was held on March 13, 1987 and on March 19 Judge Gilmore vacated his June 26, 1986 decision and reissued it unchanged as of March 19, 1987. GEICO then noted this appeal, challenging Judge Gilmore's decision that GEICO was obligated to defend against the third-party claim. Frances Ropka, as Michael Chilcoat's personal representa-

tive, filed a cross-appeal, contending that the trial judge improperly granted GEICO's Motion to Revise Enrolled Judgment.[1]

## I.

The first issue we must dispose of is a procedural one. If GEICO's Motion to Revise Enrolled Judgment was improperly granted, then GEICO would have failed to appeal the judgment entered against it within the 30–day period prescribed by Rule 1012. Thus, we would be without jurisdiction to entertain an appeal on the merits of the declaratory judgment entered on June 26, 1986.

Section 6–408 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland provides:

### § 6–408. Revisory power of court over judgment.

For a period of 30 days after the entry of a judgment, or thereafter pursuant to motion filed within that period, the court has revisory power and control over the judgment. After the expiration of that period the court has revisory power and control over the judgment only in case of fraud, mistake, *irregularity, or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule.* (1977, ch. 271). Md.Cts. & Jud.Proc.Code Ann. § 6–408 (1984 Repl. Vol., 1987 Cum.Supp.) (emphasis added).

Similarly, Maryland Rule 2–535(b) provides that a trial court has continuing revisory power over judgments. It provides:

### Rule 2–535. REVISORY POWER
\* \* \* \* \* \*

### (b) Fraud, Mistake, Irregularity.—

On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

---

1. Conrail took no position regarding the issue of whether the trial court properly exercised its revisory power under Rule 2–535.

■ Failure to provide a copy of an order required to be sent by Rule 1–324 can be grounds for exercising the court's revisory power. *See Maryland Lumber Co. v. Savoy Constr. Co.*, 286 Md. 98, 405 A.2d 741 (1979); *Kramer v. McCormick*, 59 Md.App. 193, 474 A.2d 1346 (1984). As the Court of Appeals noted in *Mutual Benefit Society of Baltimore, Inc. v. Haywood*, 257 Md. 538, 263 A.2d 868 (1970):

> The express provision for notice to the litigants overrides our often stated proposition that it is the duty of the defendant "to keep [him]self informed as to what [is] occurring in the case."

*Id.* at 541, 263 A.2d 868, citing *Tasea Inv. Corp. v. Dale*, 222 Md. 474, 479, 160 A.2d 920 (1960).

Ropka, as cross-appellant, contends that GEICO failed to establish sufficiently that the court clerk failed to send GEICO a copy of the order as required by Rule 1–324. Pursuant to *Bowen v. Rohnacher*, 15 Md.App. 280, 290 A.2d 560, *cert. denied*, 266 Md. 742 (1972), GEICO must establish the irregularity by "clear and convincing" evidence. *Id.* at 284, 290 A.2d 560.

■ After reviewing the record, we find that GEICO met its burden of proving that a copy of the order was not sent to its counsel. It should be noted at the outset that the clerk's office in Carroll County did not keep a record that definitively showed whether a copy of the order was sent to counsel for GEICO. The attorneys for GEICO filed affidavits stating they had not received a copy of the order, and testified to that effect at the hearing. There also was testimony from Doris Haines of the clerk's office who was personally responsible for making the docket entries and mailing copies of the orders to the proper parties. In response to a question about to whom she most likely mailed copies of the order, she testified:

> I went to the last two pleadings and took the names from there. I told him [counsel for GEICO] that's probably who I sent copies to, but that I could not be sure....

> \*　　\*　　\*　　\*　　\*　　\*

I ... could not be sure of that. I never told [GEICO's counsel] I was certain of anything.

The notation on the docket stated that copies of the order were sent to "Plaintiff's Attorney" and "Defendant's Attorney," both in the singular. Thus, the docket entry appears to confirm GEICO's claim that copies of the order were mailed to only two of the three parties who should have received them.

We hold that the evidence was legally sufficient to establish that GEICO was not sent a copy of Judge Gilmore's final order. That determination alone, however, does not automatically entitle GEICO to a reissuance of the order. As the party moving to set aside an enrolled judgment, GEICO must also establish "that it is acting in good faith, with ordinary diligence, and that it has a meritorious defense or cause of action." *Maryland Lumber Co. v. Savoy Constr. Co.*, 286 Md. at 102, 405 A.2d 741.

Applying the *Maryland Lumber* standard, we believe that the trial judge was correct in giving GEICO an opportunity to appeal the merits of the declaratory judgment action. Implicitly, he found no indication that GEICO acted in any way other than consonant with good faith. Judge Gilmore wholly accepted the statements of the attorneys for GEICO that they did not receive a copy of the order and that, consequently, they were not on notice that the 30–day period for appeal had begun to run.

■ Furthermore, the evidence was sufficient to establish that GEICO's counsel acted with ordinary diligence. The hearing on the declaratory judgment was held on December 5, 1985. In March 1986 counsel for GEICO had been advised of a heavy backlog of cases dating back to May 1985 and, therefore, he anticipated a long wait. Judge Gilmore's order was issued on June 25, 1986. It appears from the record that one of the attorneys for GEICO investigated the status of the declaratory judgment action on September 30, 1986, and discovered that the order had been enrolled. He promptly instituted the Motion to Revise

on October 2, 1986. Judge Gilmore did not abuse his discretion in granting the motion to revise.

## II. DUTY TO DEFEND

We now turn to the merits of the declaratory judgment action. GEICO argues that it is not required to defend Michael Chilcoat's estate in the third-party claim because of a household exclusion in the decedent's insurance policy. The exclusion provided:

> *Bodily injury* to an *insured* or any family member of an *insured* residing in the *insured's* household is not covered.

(Emphasis in the policy.)

It is generally true that an insurer has no duty to defend a cause of action against an insured if that cause of action asserts liability on the part of the insured that comes within an exclusion in the insurance policy. *See* Appleman, *Insurance Law and Practice,* § 4685, p. 119 (2d ed. 1979) ("Even though an accident might otherwise be covered, if the claim is for injuries to people that are excluded by the policy, there is no duty to defend."). It is also settled, however, that a clause in an insurance policy which is contrary to the public policy of this State is invalid and unenforceable. *See Jennings v. Government Employees Ins. Co.,* 302 Md. at 356, 488 A.2d 166, citing *Guardian Life Ins. v. Insurance Comm'r,* 293 Md. 629, 643, 446 A.2d 1140 (1982). The Court of Appeals in *Jennings* found that the mandatory insurance statutes passed by the General Assembly "substantially changed the public policy of this State with regard to motor vehicle insurance and reparations for damages caused by motor vehicle accidents." [2] *Id.* 302 Md. at

---

**2.** The *Jennings* court noted:

> By Ch. 73 of the Acts of 1972, as supplemented by later statutes such as Ch. 562 of the Acts of 1975, primarily codified in §§ 17–101 through 17–110 of the Transportation Article, and §§ 234B, 240AA through 242, 243 through 243L, 539 through 547 of the Insurance Code (Art. 48A), the General Assembly mandated that all Maryland automobiles, plus many other types of motor vehicles, be covered

357, 488 A.2d 166. After an analysis of a household exclusion identical to the exclusion in the case *sub judice,* the Court of Appeals in *Jennings* concluded:

In our view, the household exclusion clause is inconsistent with the public policy which the General Assembly adopted in Ch. 73 of the Acts of 1972, providing for compulsory automobile insurance for all Maryland automobiles with specified required coverages.

*Id.*

█ Pursuant to *Jennings,* GEICO is required to defend the estate against the third-party claim despite the household exclusion. GEICO, however, argues that the *Jennings* decision was "an improper exercise of legislative power." Clearly, GEICO cannot expect this court to overrule recently announced opinions of the Court of Appeals. *See Wiggins v. State,* 22 Md.App. 291, 302, 324 A.2d 172 (1974), *aff'd,* 275 Md. 689, 344 A.2d 80 (1975).

█ Alternatively, GEICO argues that *Jennings* cannot be applied to the case at bar because *Jennings* was decided after its declaratory judgment action was instituted. We note, preliminarily, that in *Jennings* the Court of Appeals did not decide whether household exclusions in automobile liability policies were invalid retrospectively. The court invalidated the exclusion at issue in *Jennings,* although there too the insurer had inserted the provision without knowledge the court would find it was void as against public policy. GEICO contends that invalidating the household exclusion in Michael Chilcoat's insurance policy would be an improper "invalidation of a contract clause which was valid under existing law during the entire time the contract was in force." This argument is fatally flawed, however, because it is based on a fallacy: it assumes that the exclusion was valid until *Jennings* was decided. This assumption is simply incorrect. The court in *Jennings* did not

---

by automobile insurance policies containing certain types of required coverages.
302 Md. at 357, 488 A.2d 166 (footnote omitted).

make new law. Rather, it was for the first time faced with an evaluation of the household exclusion in light of the legislature's passage of the 1972 compulsory insurance laws. The household exclusion was not included in Michael Chilcoat's policy until 1979, and the exclusion was invalid *ab initio*. This is not a case involving retroactive application of a statute to a previously existing contract. Consequently, GEICO's arguments that *Jennings* cannot be applied "retroactively" have no relevance. As the Court of Appeals noted in response to a similar argument:

> [I]t seems to be suggested that decisions of this court are not "applicable retroactively". Such a suggestion is groundless.... [C]ourts ... adhere, with relentless logic, to the orthodox theory that courts "declare" the law as it has been from the beginning. "Judge-made law" has no date of enactment. Rules of construction and constitutional limitations against retroactive legislation are not applicable to judicial decisions.

*Fletcher v. Safe Deposit & Trust Co.*, 193 Md. 400, 410, 67 A.2d 386 (1949).

### III. EXTENT OF GEICO'S POTENTIAL LIABILITY

■ Our decision that GEICO must defend against the third-party claim asserted against Michael Chilcoat's estate does not end our inquiry, however. We are also faced with the question of the extent of GEICO's potential liability. GEICO seeks a determination that under *State Farm Mutual Automobile Insurance Co. v. Nationwide Mutual Insurance Co.*, 307 Md. 631, 516 A.2d 586 (1986), its liability is limited to the amount of the minimum liability coverage required by the compulsory insurance laws.[3] In *State Farm*, the Court of Appeals explained that *Jennings* did

---

**3.** Ropka and Conrail, as appellees, argue that GEICO failed to litigate this issue at trial, and that GEICO is precluded from raising it on appeal by Rule 1085. We find, however, that GEICO's prayer for relief, which asked for a declaration that it was not liable for any amounts under the policy because of the household exclusion, adequately raised the issue of whether GEICO was only partially liable for judgments rendered against the Chilcoat estate.

not wholly invalidate household exclusions in automobile liability policies:

> We are now asked to decide a question that was neither raised nor expressly addressed in *Jennings:* Whether the "household exclusion" is wholly invalid, or whether its invalidity extends only to the amount of the minimum liability coverage required by the compulsory insurance law.

307 Md. at 633, 516 A.2d 586. The court went on to hold:

> Put simply, what the legislature has prohibited is liability coverage of less than the minimum amounts required by § 17–103(b)(1) of the Transportation Article. That is the plain import of Art. 48A, § 541(a). *See also* § 541(c)(2). The "household exclusion" violates public policy only to the extent it operates to prevent this mandatory minimum coverage.

*Id.* at 637, 516 A.2d 586 (footnote omitted). *See also Provident Gen. Ins. Co. v. McBride,* 69 Md.App. 497, 518 A.2d 468 (1986).

A. Discretion—Court's Revisory Power

■ We pause at this juncture to note that this appeal in part stems from the refusal of the trial court to modify its judgment insofar as *State Farm* may be applicable. While it does not specifically so argue, we believe that, in effect, GEICO asks us to hold that the trial judge abused his discretion in refusing to consider the application of *State Farm.* This case is before us in a most peculiar posture. The judgment of June 26, 1986, was revised by Judge Gilmore, pursuant to Maryland Rule 2–535(b), in order to give GEICO the opportunity to note an appeal. At that time, the question of *State Farm*'s applicability automatically became viable, and that part of the judgment which ignored *State Farm* was subject to revision under Rule 2–535(a). The question of whether it should be further revised was within the sound discretion of the trial court. *Clarke Baridon v. Union Co.,* 218 Md. 480, 483, 147 A.2d 221 (1958) (whether a judgment properly entered should be

vacated in whole or in part is within the sound discretion of the trial court); *Weaver v. Realty Growth Investors,* 38 Md.App. 78, 379 A.2d 193 (1977). If the case were one of default or similar technical deficiency, that discretion, of course, must be exercised liberally. Here, however, the reason for seeking further revision is not default or a similar procedural deficiency, but rather what law should govern.

Under the unique procedural posture of this appeal, it is not a simple task to determine whether there has been an abuse of discretion. The following chronology is pertinent to an understanding of our consideration of this issue.

(1) February 7, 1985—GEICO filed a declaratory judgment action to establish its duties under the Chilcoat policy.

(2) February 22, 1985—The Court of Appeals held in *Jennings* that the "household exclusion" clause is invalid.

(3) June 26, 1986—The circuit court handed down its Memorandum Opinion and Order adverse to GEICO.

(4) October 2, 1986—GEICO filed a Motion to Revise Enrolled Judgment because it did not learn about the court's order until September 30, 1986.

(5) November 7, 1986—*State Farm* was decided holding the "household exclusion" invalid only to the extent of Maryland's minimum statutory liability for automobile insurance policies.

(6) March 13, 1987—A hearing was held on GEICO's Motion to Revise.

(7) March 19, 1987—Judge Gilmore vacated his Opinion and Order of June 26, 1986, and re-entered it.

Thus, as mentioned earlier, the question of whether the trial court abused its discretion in not applying *State Farm* arises in an unusual procedural context. At the time of Judge Gilmore's first Opinion and Order, *State Farm* had not been decided, but it had been decided prior to the court's hearing on the Motion to Revise.

Over a century ago, the Court of Appeals stated:

It is a settled doctrine, that courts in deciding questions arising before them, will look to the law as it is at the time, and are not to be governed by what it may have been—unless proceedings under a prior existing law had been complete, or rights had become vested. This principle has been held to apply as well to cases before an appellate court, as to those that are pending in courts of original jurisdiction.

*Wade v. St. Mary's Indust. School,* 43 Md. 178, 181 (1875) (citations omitted); *see also Firstman v. Atlantic Constr. & Supply Co.,* 28 Md.App. 285, 294–98, 345 A.2d 118 (1975). We have found no Maryland cases, however, that discuss whether a trial judge should employ its revisory powers to modify a judgment pursuant to a subsequent Court of Appeals decision. We note, however, that numerous federal cases have arisen in this context under Fed.R.Civ.Pro. 60(b)(6), which provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

It is generally held that no relief from a final judgment is available under this rule merely because of a change in the law. *See Collins v. City of Wichita,* 254 F.2d 837, 839 (10th Cir.1958) ("Litigation must end some time, and the fact that a court may have made a mistake in the law when entering judgment, or that there may have been a judicial change in the law after its entry, does not justify setting it aside.") (citing *Sunal v. Large,* 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947); *Simmons Co. v. Grier Bros. Co.,* 258 U.S. 82, 42 S.Ct. 196, 66 L.Ed. 475 (1922); *Elgin Nat. Watch*

*Co. v. Barrett,* 213 F.2d 776 (5th Cir.1954); *United States v. Kunz,* 163 F.2d 344 (2d Cir.1947)).

In *Overbee v. Van Waters & Rogers,* 765 F.2d 578 (6th Cir.1985), however, the court granted relief under Fed.R. 60(b)(6). This negligence action, that accrued on November 11, 1977, was removed to federal court, where trial began on March 31, 1981. At the close of all the evidence, plaintiffs requested an instruction on comparative negligence. The court, applying Ohio law, instructed the jury on contributory negligence and the jury returned a verdict in favor of the defendants. Judgment was entered by the court on April 3, 1981. Plaintiffs moved for a new trial based on allegations that extraneous prejudicial information was improperly brought before the jury. The court denied the motion without a hearing and an appeal was filed. Effective June 20, 1980, the Ohio legislature adopted comparative negligence, but the Act was unclear as to whether it applied to causes of action that accrued after the effective date, or to actions tried after that date. On August 11, 1982, while the *Overbee* case was on its first appeal, the Supreme Court of Ohio held that the Act applied to causes of action that accrued after the June 20 effective date. On May 10, 1983, the 6th Circuit Court of Appeals reversed the denial of a new trial and remanded the case for an evidentiary hearing on the jury misconduct issue. While on remand, but prior to the hearing, the Supreme Court of Ohio reversed itself and held that the Act applied to cases tried after June 20, 1980. Plaintiffs then filed a motion for relief pursuant to Fed.R. 60(b)(6) requesting a new trial so that the jury could receive an instruction on comparative negligence. The District Court denied the motion without analysis in the same opinion and order that held, after a hearing, that there was no basis to set aside the jury's verdict. A second appeal followed. The 6th Circuit Court of Appeals reversed and ordered a new trial.

The appellate court held that the District Court had abused its discretion in denying relief under Fed.R. 60(b)(6) for two reasons. First, the court found there was no final

judgment when the motion was filed because the case was on remand at the time. Second, the court found extraordinary circumstances justifying relief. The court explained:

The action of the Ohio Supreme Court in reversing itself within one year is certainly an unusual occurrence. Had that court reached the decision in *Viers* [*v. Dunlap,* [1 Ohio St.3d 173] 438 N.E.2d 881 (1982)] that it ultimately reached in *Wilfong* [*v. Batdorf,* [6 Ohio St.3d 100] 451 N.E.2d 1185 (1983)], plaintiffs would have prevailed on the instruction issue during the first appeal to this court. *Id.* at 580.

While *Overbee* is somewhat persuasive, before we can determine whether the trial judge abused his discretion here, we deem it appropriate to review the evidence that had come before him prior to his decision rejecting *State Farm* and the legal principles generated by that evidence.

At the hearing on the merits held on December 5, 1985, in addition to the testimony of Alfred Charles Fulton, an underwriter for GEICO, GEICO filed a number of exhibits in support of its position. The argument at that point in time focused primarily on two issues: one, whether *Jennings* was retroactive, and two, the applicability of Art. 48A, § 240AA. The evidence presented at the hearing on the Motion to Revise related solely to the issue of the mailing and receipt of the Opinion and Order of June 25, 1986. The oral argument at the hearing on the Motion to Revise as it related to the application of *State Farm* was *de minimus.*

We have no doubt that *State Farm* controls and, thus, would reduce GEICO's liability to the statutory minimums of $20,000 and $40,000, absent any defects with respect to GEICO's implementation of the family exclusion, *i.e.,* the implementation of its reduction of coverage. The Court of Appeals in *State Farm* apparently recognized that its holding might not obtain where the insured was improperly deprived of a contractual benefit for which he had paid. Judge Adkins, speaking for the court, observed:

Nationwide persuaded Judge Heise that to uphold the exclusion as to coverage above the statutory minimum would somehow deprive the insured of a contractual benefit for which he had paid. The judge found that "The insured has already paid additional premiums in order to purchase the additional coverage." Memorandum of Opinion and Decree at E–90. The record, however, is silent as to how much Carroll paid for his State Farm policy, or how the premium was computed. It could just as readily be inferred that the premium took account of the exclusion contained in the policy. In any case, Judge Heise's finding, being without evidentiary support, is clearly erroneous. Md.Rule 886; *see Stuart Kitchens, Inc. v. Stevens*, 248 Md. 71, 234 A.2d 749 (1967).

*State Farm*, 307 Md. at 638.

Recognizing this opening in *State Farm*, Conrail argues that *State Farm* is not dispositive of this case because it is readily distinguishable. Conrail contends that:

*State Farm, supra,* is factually distinguishable from the present case. There, the Circuit Court had held that to uphold the household exclusion as to the amount of coverage in excess of the statutory minimum would deprive the insured of a contractual benefit for which he had paid. The trial court's conclusion in that regard was rejected by the Court of Appeals as being without evidentiary support, since the record was silent as to the premium paid for the coverage.

The record here is not silent in that regard.... Between March 1, 1970 and March 1, 1979, the policy form did not include a household exclusion as to liability coverage. Such an exclusion was first added by policy amendment effective March 1, [1979]. No notice of the newly included limitation of coverage was sent to Mr. Chilcoat. GEICO's witness conceded that the policy change limited the scope of risks which had been undertaken by GEICO. Despite the limitation in coverage and a reduction in the scope of coverage afforded under GEICO's policy as a

result of the addition of the household exclusion, GEICO made no adjustment in the premium charged to Mr. Chilcoat. As a result, subsequent to March 1, 1979 Mr. Chilcoat was paying to GEICO the same premium for less coverage.

In its reply brief, GEICO responded as follows:

Conrail has also concocted an argument that *State Farm* does not apply because it would deprive Chilcoat of a paid for benefit (Conrail Br. 23). There is no support in the record for this argument. The record is undisputed that GEICO followed all applicable statutory procedures in adding the household exclusion to the Chilcoat contract (E. 206–212). The policy which included the household exclusion was sent to Chilcoat in 1980 (E. 212), and it certainly defies common sense to argue (Conrail Br. 24) that somehow in 1982 Chilcoat paid for a policy that did not have this exclusion.

In contrast to *State Farm*, testimony in the case at bar by an underwriter for GEICO established that the first policy was issued to Michael Chilcoat on March 1, 1970. The policy was renewed annually until Mr. Chilcoat's estate requested that it be cancelled on February 4, 1983. The household exclusion was not added to the Chilcoat policy until about March 1, 1979, when an amendment,[4] which was the first of seven pages of amendments, was mailed to Mr. Chilcoat. Although Mr. Chilcoat was sent what was characterized by GEICO's witness as a "new contract" when the policy was renewed in 1980, there was no evidence before the trial court that there was ever any other explanation beyond that of the first page of amendments. Furthermore, although the exclusion eliminated a potential class of insureds, the underwriter stated that GEICO made no adjustment in the premiums paid by Mr. Chilcoat. No additional evidence was offered about rates in general, premium

---

4. *See* Appendix p. 1 for a copy of the household exclusion amendment.

reductions, or the relationship between rates and policy changes.

As indicated earlier, the question of the operation and effect of § 240AA was extensively argued below.[5] Conrail in its appellate brief asserted that there was no notice of the change in coverage. We believe that the question of the adequacy of notice and the applicability of § 240AA are inexorably intertwined.

### B. Notice and § 240AA.

It has been held universally, by the jurisdictions that have reached the issue, that "where an insurer agrees to renew a policy, the insured should have a right to expect that the new protection will be in substance the same as that afforded by the former contract and upon the same conditions." Couch, *Couch on Insurance 2d,* § 68.61. This rule of law is consonant with the reasonable expectations of an insured, to whom an agreement to "renew" a policy conveys the impression that he is obtaining an extension of the policy already in effect and not negotiating a new contract under different terms. Because of this expectation of the insured and because of the unequal bargaining positions of the insured and the insurance company, the insured is protected by a dual scheme of statutory and common law notice requirements.

### Common Law Notice Requirements

Most jurisdictions impose an affirmative duty on the insurer to make the insured aware of changes inserted into a renewal policy; absent notice of the change, the insured is entitled to coverage as the policy originally stated. *See generally, Couch,* § 68.61. *See also Whiteside v. New Castle Mut. Ins. Co.,* 595 F.Supp. 1096 (D.Del.1984) (change in policy invalid where insured was sent a renewal policy

---

**5.** Discussion on that issue appeared at pages 10–11 of appellant's Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment and at pages 5–6 of appellee's Issue Memorandum.

with letter stating policy was a renewal but no notice given of change in terms of policy); *Noyes Supervision, Inc. v. Canadian Indem. Co.,* 487 F.Supp. 433 (D.Col.1980) (exclusion invalid in renewal policy issued after the accident); *River Services Co. v. Hartford Accident and Indemnity Co.,* 449 F.Supp. 622 (N.D.Ohio 1977) (insurer could not bind insured to exclusion in a renewal policy of which insured had no knowledge); *Giles v. St. Paul Fire & Marine Ins. Co.,* 405 F.Supp. 719 (N.D.Ala.1975) (renewal policy contained new exclusions, only some of which were contained in the summary of changes; the exclusion held invalid was in an accompanying endorsement but not in the summary of changes).

The rationale for requiring notice to the insured was explained by the Supreme Court of New Jersey in *Bauman v. Royal Indemnity Co.,* 36 N.J. 12, 174 A.2d 585 (1961):

When an insured purchases an original policy of insurance he may be expected to read it and the law may fairly impose upon him such restrictions, conditions and limitations as the average insured would ascertain from such reading. However, where the stated period of coverage in the original policy is about to expire and the insurance company simply sends a renewal policy for the new period of coverage, the insured, in all likelihood, will not read it over again and may not fairly be expected to do so. Absent notification that there have been changes in the restrictions, conditions or limitations of the policy, the insured is justly entitled to assume that they remain the same and that his coverage has not in anywise been lessened.

174 A.2d at 591–92.

There is a dearth of authority, however, to determine what sort of notice is adequate to apprise the insured of a change contained in the renewal policy. In *Giles v. St. Paul Fire & Marine Ins. Co.,* 405 F.Supp. 719 (1975), the insured was a law firm that carried its professional liability insurance with the defendant/insurer. The insured was given a letter which stated the policy excluded liability for

all securities work and an endorsement that reiterated that same exclusion. Although the letter was found in the insured's file, the court found as a matter of fact that the insured did not read the letter and had no knowledge of the exclusion. The court noted that the agent who brought the policy to the insured testified that he removed the *policy* from an envelope and that he did not state that he removed the letter outlining the exclusion from the envelope as well. The agent explained to the insured that the policy contained an exclusion for all liability for acts committed in knowing violation of SEC rules. He, however, did not point out the separate exclusion in the endorsement of liability for *all* securities work, which subsumed the other exclusion. The court found that it was immaterial that the insured did not read the endorsement inasmuch as the insured testified he read a summary of changes that was included within the policy and that did not contain the exclusion included in the endorsement. The court held that the insured was not adequately informed of the change and that the insured should have the benefit of the greater coverage provided by its original policy.

In *Fields v. Blue Shield of California,* 163 Cal.App.3d 570, 209 Cal.Rptr. 781 (1985), the subscriber sued Blue Shield for its refusal to pay for psychoanalysis. When the subscriber enrolled in 1975, he was covered up to a lifetime maximum of $50,000. For the plan year 1976, the subscriber received a 32–page benefit plan brochure. It informed the reader that the brochure should be read in its entirety because "clarifications" were included throughout the plan. The 1976 plan contained an exclusion for psychoanalysis if the insured received credit for psychoanalysis as a part of an educational program, as the subscriber did in *Fields.* The exclusion, however, was not contained in a section entitled "How Plan Changes" nor was it included under a section entitled "Exclusions." The court noted that the exclusion was placed under a heading describing "Supplemental Benefits" and that the print was relatively small. The court went on to say:

[I]n the case of "standardized" (insurance) contracts, made between parties of unequal bargaining strength, exceptions and limitations on coverage the insured could reasonably expect must be called to the subscriber's attention clearly and plainly before the exclusion will be interpreted to relieve the insurer of the liability for performance. The uncontested evidence before the trial court demonstrates this limitation of coverage was placed, not in the limitation or exclusion section, but at the end of benefit granting provisions. Blue Shield did not notify Dr. Fields by a clear, conspicuous notice in an expected place that coverage he originally had was now totally withdrawn.

*Id.* at 579, 209 Cal.Rptr. 781, citing *Steven v. Fidelity and Casualty Co.*, 58 Cal.2d 862, 879, 27 Cal.Rptr. 172, 377 P.2d 284 (1962) (citations omitted). Thus, the court concluded that Blue Shield was bound by the coverage offered in the previous plan.

The Supreme Court of Minnesota in *Canadian Universal Insurance Co. v. Fire Watch, Inc.*, 258 N.W.2d 570 (Minn. 1977), held that an endorsement which reduced coverage of a presently-existing policy was not sufficient to give notice to the insured of the reduction in coverage. The court cited a California case which held:

"We think the law is well established that an insurer must convey to the insured an explanation of the provisions of his insurance policy in terms which he can comprehend. As we said in *Young v. Metropolitan Life Ins. Co.* (1969) 272 Cal.App.2d 453 at 460–461, 77 Cal. Rptr. 382 at 387, 78 Cal.Rptr. 568:

" 'It is now firmly settled that insurance contracts are contracts of adhesion between parties not equally situated * * *. Consequently, the insurer, as the dominant and expert party in the field, must not only draft such contracts in unambiguous terms but must bring to the attention of the insured all provisions and conditions

which create exceptions or limitations on the coverage
* * *.'

* * * * * *

"We deem that fairness requires that when an insurer
makes basic coverage changes in insurance afforded a
long-time insured, it has an obligation to inform the
insured, by cover-letter or a conspicuous heading to the
amendatory endorsement, or some similar means, that the
endorsement contains significant changes in coverage,
and offer to explain and discuss the significance of the
changes to the insured upon request."

258 N.W.2d at 574–75, citing *Allstate Ins. Co. v. Reeves*, 66
Cal.App.3d 464, 469, 136 Cal.Rptr. 159 (1977).

In a recent case the First Circuit found that the insured
was adequately informed of a reduction in coverage for
theft of silverware. *See Mundy v. Lumberman's Mut.
Casualty Co.*, 783 F.2d 21 (1st Cir.1986). The court pointed
to the fact that a notation on the front of the policy written
in capital letters informed the insured that the renewal
contained some changes. Inside the policy was a one-page
summary of changes contained in the renewal. Each
change was described in a separate paragraph, set off from
the others by added space and black dots. The summary at
issue read: "Theft of silverware ... is now limited to
$1,000. Should you wish more coverage for such items,
contact your agent." The court recognized that most juris-
dictions require that an insured be specially informed of
changes contained in a renewal policy but concluded that
"even 'a casual reading of the mailed material' would have
given the [insureds] adequate notice." *Id.* at 23, citing
*GEICO v. United States*, 400 F.2d 172, 175 (10th Cir.1968),
wherein the 10th Circuit held that notice was satisfied by a
"short, separately attached boldly worded modification."

The notion that adequate notice is required is supported
by Maryland case law which, although not precisely on
point, holds that renewal of an insurance policy is an
extension of the policy's life and not a new contract. *See*

*World Ins. Co. v. Perry*, 210 Md. 449, 454, 124 A.2d 259 (1956). In *Mallette v. British Am. Assurance Co.*, 91 Md. 471, 46 A. 1005 (1900), the insured told his agent he wanted the policy renewed, and that he would send payment to the insurance company. After the insured sent partial payment, the property was destroyed by fire. The insurer argued that the policy could not be renewed without payment of the full premium. The court disagreed and held that the insurance continued because the insured was not told of this requirement. In answer to the insurer's argument that there could be no policy because nothing was said about the terms and conditions of the renewal, the court said:

> [W]e hold that where there is an agreement for a renewal of a policy, the insured is justified in assuming that the premium, and all the terms and conditions of the renewal will be the same as those of the original, unless he has notice of some proposed change.

*Id.* at 482, 46 A. 1005.

### Statutory Notice Under § 240AA

The Insurance Article of the Annotated Code of Maryland also prescribes a scheme for notification of insureds in the event their coverage is reduced under a motor vehicle liability policy. *See* Art. 48A, § 240AA Md.Ann.Code. Although the provisions of § 240AA were amended effective July 1, 1979, at the time of the amendment to the Chilcoat policy on March 1, 1979, the statute provided:

**§ 240AA. Procedure for cancellation, nonrenewal, increase in premium or reduction of coverage under motor vehicle liability insurance policy.**

(a) *Compliance with article.*—Except in accordance with the provisions of this article, *no insurer* other than the Maryland Automobile Insurance Fund *shall* (i) cancel or fail to renew a policy of motor vehicle liability insurance issued in this State, as to any resident of the household of the named insured, for any reason other than nonpayment of premium, or (ii) increase a premium

for any coverage on any such policy unless the increase is part of a general increase in premiums approved by the Commissioner and does not result from a reclassification of the insured, or (iii) *reduce the coverage under any such policy unless the reduction is part of a general reduction in coverage approved by the Commissioner* or to satisfy the requirements of §§ 539 through 541 of this article, inclusive.

(b) *Notice to insured.*—An insurer intending to take an action subject to the provisions of this section shall, on or before forty-five days prior to the proposed effective date of the action, send written notice by certified mail of its intended action to the insured at his last known address. The notice shall be in triplicate, and shall state in clear and specific terms, on a form approved by the Commissioner. . . .

(1979 Repl. Vol.) (Emphasis added).

■ The language of § 240AA (as it applied at the time of the amendment to the Chilcoat policy) can be read to require an insurance company which reduces coverage to send notice [6] of its action by certified mail. GEICO argued

---

**6.** A subsequently promulgated regulation, effective July 30, 1981, lends support to this reading:

**Title 09**
**DEPARTMENT OF LICENSING AND REGULATION**
**Subtitle 30 INSURANCE DIVISION**
**Chapter 32 Addition, Reduction, or Elimination in Coverage Notice Requirement**
Authority: Article 48A, §§ 26, 230, 242, Annotated Code of Maryland

**.01 Purpose.**
Often when a property and casualty policy is renewed, coverage is reduced or eliminated or deductibles are increased. There may also be automatic increases in policy limits pursuant to construction or inflation indices. The purpose of these regulations is to require all property and casualty insurers who intend to reduce or eliminate coverage, change a deductible or increase policy limits to clearly notify the policyholder of the action that has been taken.

**.02 Notice Requirement.**
A. After July 30, 1981, if any insurer upon renewal or by endorsement initiates any change in any primary property or casualty policy, which is not at the request of the insured (*except for motor*

below that § 240AA(b) was inapplicable where the reduction was part of a general reduction in coverage approved by the Commissioner. We believe that the trial court did not consider the applicability of § 240AA, as in its first opinion it relied solely on *Jennings* and on the Motion to Revise it summarily refused to consider *State Farm*'s application. How § 240AA is to be interpreted is a matter critical to this case. An insurer that fails to comply with the procedures specified in § 240AA forfeits its right to enforce the reduction in coverage and is bound to the extent of the coverage that existed before the attempted reduction. *See* § 240D Ann.Code of Maryland (1979 Repl. Vol.). *See also Government Employees Ins. Co. v. Insurance Commissioner*, 40 Md. App. 201, 389 A.2d 422 (1978).

It was undisputed at the hearing on the merits that the amendment sent to Mr. Chilcoat was not sent by certified mail, nor was there any reduction in premium resulting

---

*vehicle liability insurance to which Article 48A, § 240AA is applicable* ), which effects an elimination of or reduction in benefits including any increase in deductible, the insurer shall give the insured, in general terms, written notice of the change in the policy. The notice may be mailed or delivered to the insured by the insurer or its authorized representative, in which case the insurer shall provide its authorized representative with the appropriate notice. This notice can be by way of the following phrase or its equivalent: Notice: Certain coverage in this policy has been eliminated or reduced, or a change has been made in the deductible. The description of the change in coverage or deductible is as follows:

B. After July 30, 1981, if any coverage is automatically added at renewal pursuant to policy terms which allows for any inflation or construction increases, the insured shall be, in general terms, informed that the coverage has been increased.

C. This regulation is not applicable to commercial risks who use the services of a risk manager, broker, or insurance adviser.

**.03 Penalties.**

If any insurer issues a policy in this State in which a change in coverage or deductible pursuant to Regulation .02A occurs and no notice as required above is given to the policyholder, then the policy with adjustment in premium shall be treated as being in effect without the change or reduction in coverage or deductible when a claim occurs which is affected by the change.

**Administrative History**

Effective date: July 30, 1981 (8:12 Md.R.1060).

(Emphasis added).

from the reduction in coverage. The "premium" issue, likewise apparently was not considered by the trial judge as *Jennings* was dispositive at the time of the hearing on the merits, and the premium issue was not raised again at the hearing on the Motion to Revise. But we believe that it is not without significance.

C. Premium.

As noted earlier, the *State Farm* Court found an evidentiary deficiency with respect to any question of premium reduction and, thus, found that the trial judge was clearly erroneous.

In the case *sub judice*, there was testimony that the insured's coverage had been decreased while his premium had not. That testimony alone, however, does not necessarily mean that an insurance carrier must decrease its premium if it decreases coverage. Clearly, a decrease in the premium owing to a decrease in coverage can be completely obliterated by a rate increase that goes into effect at the same time. It is also clear that an insured's premium typically provides consideration for the benefits provided by the policy, no more and no less.

■ If it can be shown, however, that the insured received less coverage than that for which he paid and if there was no consideration for the reduction, the attempted policy modification should be invalid for lack of consideration. As explained in *Couch on Insurance 2d:*

> Since [a] modification [of an existing insurance policy] is contractual in nature, it follows that there must be consideration to support the obligation of each party thereunder. Detriment to the insurer, as well as a benefit to the insured, constitutes sufficient consideration.

Couch, *Couch on Insurance 2d,* § 65.9 (footnotes omitted).

Another leading authority states:

> The original policy premium generally will not be considered the needed additional consideration for a restrictive endorsement, and where there has been no reduction in premium as consideration for an exclusion clause reducing the coverage contracted for in original policy, the exclusion clause may be invalid for lack of adequate consideration.

Appleman, 13A *Insurance Law and Practice*, § 7603.

In *State Farm v. Potts*, 131 Ga.App. 26, 205 S.E.2d 43 (1974), a wrongful death action was brought against a minor motorist, his mother and her insurance carrier. After finding that the minor driver was negligent, the court held that the mother's insurance company was liable for the amount of damages rendered against the driver, despite an exclusionary endorsement which specifically excluded coverage if her car was operated by her son. The court noted that the policy, as originally issued to the insured, covered her son as an occasional driver. During the policy term, however, when the insured inquired as to whether her son was covered, the insurance agent said no and advised her that it would cost an additional premium to cover her son. The insured decided not to pay the additional amount. She so informed the insurance company. The insurer then had her execute the driver exclusion endorsement. The Court of Appeals of Georgia held the endorsement was invalid because there was no consideration for the reduction. As the court noted: "[The insured] received no reduction in her premium for the reduction of her coverage. She, in reliance on her insurance agent, truly 'paid more and got less.' " *Id.* at 44.

In a similar case, *Krebs v. Strange*, 419 So.2d 178 (Miss. 1982), the Supreme Court of Mississippi reached the same conclusion. On December 4, 1972, a "student exclusion

endorsement" was added to a policy without a corresponding adjustment of the premium. The endorsement excluded from coverage any student operating the insured's car, with the exception of the insured's daughter. On September 29, 1974, during a subsequent policy period, an accident occurred involving the insured's car while it was driven by a college friend of the insured's daughter. The court explained:

> We begin with the proposition which requires no citation of authority that insurance policies are matters of contract and the interpretation of insurance contracts is according to the same rules which govern other contracts. In order to have an enforceable insurance contract, the essential elements are an offer and an acceptance, supported by consideration. When the insurance company's offer to issue the insurance is accepted by the insured and premium payment is made, the contract is formed and the rights and obligations of the respective parties "lock in". The rights under the policy may be altered only through a modification to the insurance policy, and such a modification constitutes a new agreement which must likewise be supported by a consideration.

*Id.* at 181–82. The court rejected the insurer's argument that its forbearance from cancelling the policy on its renewal date constituted consideration. Rather, the court found that the promise was illusory and held the modification invalid for lack of consideration. We discern nothing in the record *sub judice* specifically indicating the authorization of a rate increase or the establishment of applicable rates in general.

D. Abuse of discretion.

Unfortunately, Judge Gilmore gave no reasons as to why he declined to apply *State Farm*. If he was simply unwilling to consider it, then we would be constrained to hold that

he abused his discretion and, thus, would remand for consideration of *State Farm*'s applicability in the light of the issues discussed in Part IIIA, B and C. On the other hand, he may have had a basis [7] for declining to rule that *State Farm* limited GEICO's liability.

Given the peculiar chronology of these proceedings, we believe that the purposes of justice would be advanced by permitting further proceedings in this case by developing whatever facts and law might be applicable to those issues mentioned in Parts III A, B, and C. Therefore, with respect to the extent of GEICO's liability, instead of entering a final order affirming, reversing, or modifying the judgment, we shall, pursuant to Maryland Rule 1071, remand to the lower court for further proceedings consistent with this opinion.

## IV. ATTORNEYS' FEES

 Appellee contends that if we affirm, "GEICO is required to pay the attorneys' fees and costs she has incurred in these proceedings." Had she placed the issue properly before us, she would be correct. *See Bankers & Shippers Ins. Co. v. Electro Enters.*, 287 Md. 641, 415 A.2d 278 (1980). Although appellee, in a responsive pleading

---

7. Considering common law notice requirements *sub silentio,* Judge Gilmore may have concluded as trier of the fact that (1) because there was no evidence of a cover letter or other explanatory document the first page of the seven pages of amendments sent to Mr. Chilcoat in 1979 was not adequate notice and, therefore, the former coverage was still applicable; and/or (2) because there was no evidence of a reduction in the premium and since the Court of Appeals in *State Farm* apparently suggested that non-reduction of a premium might be a factor, the consideration was not adequate on the part of GEICO and, thus, the former coverage still obtained; and/or (3) that § 240AA applied to any reduction in coverage including a general reduction and since GEICO had not complied with § 240AA(b), then the former coverage applied.

Of course, we do not decide whether such determinations are correct because they are not properly before us.

filed below, sought attorneys' fees incurred in the defense of the declaratory judgment, the circuit court in its declaratory judgment did not award attorneys' fees. Since appellee did not file a cross-appeal on this issue, the question is not before this court. *Sprecher v. Sprecher*, 206 Md. 108, 116, 110 A.2d 509 (1955). *See also Smith v. Merritt Sav. & Loan, Inc.*, 266 Md. 526, 536, 295 A.2d 474 (1972). This holding, of course, does not preclude appellee from seeking the attorneys' fees on remand as well as those connected with this appeal.

JUDGMENT AFFIRMED AS TO THE ISSUES IN PART I, II AND IV; JUDGMENT VACATED AS TO ISSUE IN PART III; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED AMONG THE PARTIES.

# APPENDIX

**FAMILY AUTOMOBILE POLICY AMENDMENT**

## GOVERNMENT EMPLOYEES INSURANCE COMPANY

*A PUBLICLY OWNED COMPANY — NOT AFFILIATED WITH THE UNITED STATES GOVERNMENT*

**WASHINGTON, D. C. 20076**

Px 2

## MARYLAND

The Company agrees with the named insured, subject to all of the provisions of the policy except as modified herein:

### A. LIABILITY EXCLUSION

The following additional exclusion is applicable:

This policy does not apply under Part I to bodily injury to any insured or any member of the immediate family of an insured residing in the same household as the insured.

### B. PERSONAL INJURY PROTECTION

| Option # | Limits of Liability |
|----------|---------------------|
| 1 | $ 2,500 |
| 2 | $ 5,000 |
| 3 | $ 7,500 |
| 4 | $10,000 |

#### SECTION I

The Company will pay the following benefits for loss and expense incurred because of bodily injury caused by accident and involving a motor vehicle:

(a) medical expense benefits to or on behalf of each injured person

(b) income continuation benefits to or on behalf of each injured person who at the time of the accident was an income producer.

(c) essential services benefits to or on behalf of each injured person who at the time of the accident was not an income producer;

#### Exclusions

This insurance does not apply:

(a) To bodily injury sustained by any person

 (1) who intentionally causes the motor vehicle accident; or

 (2) while operating or voluntarily riding in a motor vehicle known by him to be stolen, or

 (3) while in the commission of a felony or fleeing or attempting to elude a police officer; or

 (4) arising out of the ownership, maintenance, or use of a motorcycle or motorbike, by such person;

(b) to bodily injury sustained by any person while occupying a motor vehicle which is located for use as a residence or premises;

(c) to bodily injury sustained by the named insured or any relative while occupying or while a pedestrian through being struck by any motor vehicle owned by the named insured or furnished or available for the named insured's regular use and which is not an insured motor vehicle;

(d) to bodily injury sustained by any relative while occupying or while a pedestrian through being struck by any motor vehicle owned by such relative or furnished or available for the relative's regular use, which is not an insured motor vehicle;

(e) to bodily injury sustained by any person while occupying, or while a pedestrian through being struck by, any motor vehicle (other than a motor vehicle insured under this policy) for which the coverage required under Section 539, of Article 48A of the Annotated Code of Maryland is in effect, except to the extent that the limit of the personal injury protection coverage on a motor vehicle insured under this policy is in excess of the personal injury protection coverage in effect on the involved motor vehicle;

(f) to bodily injury due to war, declared or not, civil war, insurrection, rebellion, revolution, or to any act or condition incident to any of the foregoing.

(g) to bodily injury resulting from radioactive, toxic, explosive, or other hazardous properties of nuclear material.

#### Definitions

When used in reference to this insurance:

"bodily injury" means bodily injury, sickness or disease, including death resulting therefrom;

"essential services benefits" means reimbursement for necessary and reasonable payments made to others, not members of the injured person's household, incurred within three years from the date of the accident for essential services ordinarily performed by the injured person, for care and maintenance of his family or family household;

"funeral services" means funeral, burial, or cremation services;

"income" means wages, salary, tips, commissions, professional fees, and other earnings from businesses or farms owned individually or jointly or in partnership with others, and to the extent

